**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                           |   |                        |
|---------------------------|---|------------------------|
| UNITED STATES OF AMERICA  | * |                        |
| v.                        | * | Case No. PWG-19-134    |
| CHRISTOPHER WILLIAMS,     | * |                        |
| Defendant                 | * |                        |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant Christopher Williams was stopped in a vehicle with defective tail and tag lights on a private road in an apartment complex when Officer Jonathan Eveler observed him and stopped the vehicle for violations of Maryland Transportation Code ("Transportation Code"). The stop led to a drug arrest. Williams filed a Motion to Suppress, ECF No. 18, arguing that the stop violated the Fourth Amendment.[1] Williams did not violate the Transportation Code sections regarding tail and tag lights, and it was not a reasonable mistake of law to conclude that he did. However, Officer Eveler had a reasonable suspicion that Williams had just or was about to commit a violation of the Transportation Code by driving on a public highway with defective rear and tag lights. Therefore, the stop was justified under *Terry v. Ohio*, 392 U.S. 1 (1968), and Williams' motion to suppress is DENIED.

---

[1] The parties fully briefed the motion. ECF Nos. 18, 22, 25, 26, 29. I held a hearing on the motion on July 22, 2019, during which I made findings of fact. ECF Nos. 30, 34. During the hearing, I requested additional briefing, which the parties provided. ECF Nos. 33, 35, 36.

## Background

On November 1, 2018, at approximately 10:15 p.m., Officer Eveler of the Prince George's County Police Department was patrolling with several other officers on 16th Avenue in Hyattsville, Maryland, within the LaSalle Park apartment complex. Hr'g Tr., 101:5-8, ECF No. 34 ("Tr."). Undisputed testimony established that 16th Avenue is a private road that loops around the apartment complex and connects to Chillum Road, a public road. *Id.* at 14:13-22. Officer Eveler drove past a silver Mercedes, with Williams inside as the sole occupant, stopped next to a dumpster in a spot with a yellow "X" through it. *Id.* at 105:3, 101:23–102:5.[2] The vehicle's lights were on, but its right tail light and tag lights were not functioning. *Id.* at 111:22–112:21. Officer Eveler drove past the vehicle en route to assist nearby officers, but returned to Williams' vehicle approximately one minute later to initiate a stop. *Id.* at 102:6–11. At that point, Williams' vehicle began to reverse then drive forward. *Id.* at 26:7–8, 48:23–49:12. The vehicle's tail and tag lights were working. *Id.* at 103:17–22. Officer Eveler then activated his emergency lights and stopped the vehicle. *Id.* at 26:9–10. Officer Eveler testified that during the stop he detected the odor of marijuana and observed what he believed to be crack cocaine. *Id.* at 31:12, 34:8-11. Williams was arrested and an inventory search was performed of the vehicle. *Id.* at 38:10-15. During the inventory search, approximately fifteen minutes after the initial stop, the vehicle's right tail light and tag lights again were not working. *Id.* at 42:25–43:4, 103:24–104:6.

---

[2] Officer Eveler testified that the engine was running. Tr. 19:3–12. His testimony was uncontroverted, *see* Tr. 101:23–102:5, although on cross, he said that he could no longer recall if he heard the engine running, *id.* at 60:3–7.

**Discussion**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "'Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'' under the Fourth Amendment. An automobile stop, therefore, is subject to the reasonableness requirement of the Fourth Amendment." *United States v. Bowman*, 884 F.3d 200, 209–10 (4th Cir. 2018) (quoting *Whren v. United States*, 517 U.S. 806, 809 (1996); citing *Whren*, 517 U.S. at 810).

Generally, to be reasonable, a seizure must be "'based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Dunaway v. New York,* 442 U.S. 200, 213 (1979)). Probable cause exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "[S]ome latitude" exists, however, for detention without probable cause "where 'the intrusion on the citizen's privacy was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable." *Bailey*, 568 U.S. at 193 (quoting *Michigan v. Summers*, 452 U.S. 692, 697–98 (1981)). These brief detentions are known as "*Terry* stops," because in *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the Supreme Court held that "a police officer who has reasonable suspicion of criminal activity may conduct a brief investigative stop." *Bailey*, 568 U.S. at 193.

## Maryland Transportation Code

The Government argues that Williams violated two sections of the Transportation Code: § 22-204(a), regarding tail lamps, and § 22-204(f), regarding tag lights.[3] If Williams violated one or both sections, Officer Eveler had probable cause to stop Williams and the motion to suppress should be denied. Williams did not violate these sections of the Transportation Code because he was parked and not on a highway when his tail and tag lights were inoperable. Therefore, these alleged violations do not provide a basis to dismiss the motion to suppress.

Section 22-204(a) provides in relevant part that "every motor vehicle . . . shall be equipped with at least 2 tail lamps mounted on the rear, which, when lighted as required in § 22-201.1 of this subtitle, shall emit a red light plainly visible from a distance of 1,000 feet to the rear." Md. Code Ann., Transp. § 22-204(a). Section 22-204(f) states:

> Either a tail lamp or a separate lamp shall be constructed and placed to illuminate, with a white light, the rear registration plate and render it clearly legible from a distance of 50 feet to the rear. Any tail lamp or tail lamps, together with any separate lamp or lamps for illuminating the rear registration plate, shall be wired to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

Transp. § 22-204(f). Also relevant is Transp. § 22-201.1, which applies to both §§ 22-204(a) and (f). Section 22-204(a) references § 22-201.1 directly. While § 22-204(f) does not explicitly reference § 22-201.1, § 22-202(a) states:

---

[3] Officer Eveler cited Williams for violations of § 22-219(a) and § 22-204(f) of the Transportation Code. Section 22-219(a) pertains to "stop lamps," commonly known as brake lights, which the Government concedes are not at issue here. During the suppression hearing, Officer Eveler testified that Williams' right tail light was out. Both the Government's and Defendant's briefs therefore focus on § 22-204(a) regarding tail lights, instead of § 22-219(a). Officer Eveler's citation error is not legally relevant. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (rejecting rule that offense supported by known facts must be "closely related" to the offense the officer invoked).

> Whenever a requirement is declared in this subtitle as to distance from which certain lamps and devices shall render objects visible or within which the lamps or devices shall be visible, **the requirement applies during the times stated in § 22-201.1 of this subtitle** in respect to a vehicle without a load when on a straight, level, unlighted highway under normal atmospheric conditions, unless a different time or condition is expressly stated."

Transp. § 22-202(a) (emphasis added).[4] Thus, § 22-204(f)'s requirement that tag lights must be visible from a distance of 50 feet to the rear triggers § 22-202(a), which in turn provides that the lighting requirement applies during the times stated in § 22-201.1. Therefore, the lighting requirements for tail lamps and tag lights apply during the times described in § 22-201.1.

Section 22-201.1 states:

> **Every vehicle on a highway** in this State, at any time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of 1,000 feet ahead, shall display lighted lamps and illuminating devices as respectively required in this subtitle for different classes of vehicles, **subject to exceptions with respect to parked vehicles**, and further that stoplights, turn signals, and other signaling devices shall be lighted as prescribed for the use of these devices.

Transp. § 22-201.1 (emphasis added). Read in conjunction with the previously cited sections of the Transportation Code, the tail light and tag light requirements of §§ 22-204(a) and (f) apply to specific circumstances, one of which is that the vehicle must be on a highway and another of which is that the vehicle cannot be parked. *See id.*

The Transportation Code defines "park" as follows:

"Park" means to halt a vehicle, whether or not it is occupied, other than temporarily: (1) When necessary to avoid conflict with other traffic or in compliance with the directions of a police officer or a traffic control device; or (2) For the purpose of and while actually engaged in loading or unloading property or passengers.

---

[4] Neither party cited this section of the Transportation Code. Yet it is critical to understanding the applicability of § 22-204(f) because it makes clear that § 22-204(f), like § 22-204(a), is limited to the circumstances specified in § 22-201.1.

Transp. § 11-144. I have identified only one case, *Atl. Mut. Ins. Co. v. Kenney*, 591 A.2d 507 (1991), discussing this definition of parking. In that case, Respondent argued for the first time on appeal that stopping a tractor trailer in a "No Parking Zone" and unloading goods for approximately fifteen minutes did not constitute parking because it was only "temporary." *Id.* at 509–10. Ultimately the Court of Appeals of Maryland did not decide whether this timeframe was sufficiently temporary to qualify as parking for the purposes of the Transportation Code's illegal parking statute, § 21-1003. *Id.* at 510. Rather, it independently concluded that the tractor trailer was parked negligently under Maryland common law, assuming without further discussion that the vehicle was "parked" for that purpose. *Id.* at 511.

Here Williams' vehicle was stopped next to a dumpster in a parking spot with a large yellow "X" on 16th Avenue when Officer Eveler first drove past him. Officer Eveler specifically testified that Williams' vehicle was "parked." Tr. 18:18. Williams was still there approximately one minute later when Officer Eveler returned. Based on this evidence, Williams' vehicle was halted and pulled off the main road to avoid conflict with other traffic, meeting the statutory definition of parking. Because Williams' car was parked, he was not in violation of the lighting requirements in §§ 22-204(a) and (f).

Further, 16th Avenue is not a "highway" for the purposes of §§ 22-204(a) and (f) and this provides an independent basis for concluding that Williams did not violate these sections of the Transportation Code. Transportation § 11-127 defines "highway" in relevant part as "[t]he entire width between the boundary lines of any way or thoroughfare of which any part is used by the public for vehicular travel, whether or not the way or thoroughfare has been dedicated to the public and accepted by any proper authority." Transp. § 11-127.

In *United States v. Ambrose*, 942 A.2d 755 (2008), the Court of Appeals of Maryland addressed the meaning of the definition of "highway" in § 11-127. Previous Maryland case law, and cases from the District of Maryland applying Maryland case law, examined the *right* of the public to use of a roadway rather than the *fact of use* by the public to determine whether a road was a highway under the "used by the public" provision of § 11-127. *See United States v. Taylor*, 441 F. Supp. 2d 747, 752-54 (D. Md. 2006) (summarizing cases). In *Ambrose*, the Court of Appeals of Maryland reversed this approach, holding that "the proper inquiry involves a factual determination as to the character of the use of the highway or private roadway/property by the public, regardless of the restrictions placed on the public's access or use." 942 A.2d at 756.

In *Ambrose*, the court cited with approval this Court's analysis in *Taylor*, 441 F. Supp. 2d 747. *Ambrose*, 942 A.2d 765. In *Taylor*, I found that the roads within Aberdeen Proving Grounds ("APG") were "used by the public in general" under the meaning of Transp. § 21-101.1.[5] To drive into APG, non-military personnel without a federal ID were required to show a valid state driver's license and offer a legitimate reason for entering the premises. *Taylor*, 441 F. Supp. 2d at 749, 754. APG issued approximately 2,000 day passes to visitors each week, granting access to a wide array of retail and recreational facilities including golf courses, hunting grounds, boat launches, shops, restaurants, and a museum. *Id*. Based on these facts, I found that the roads within APG were used by the public.

Following *Ambrose*, this Court reached a similar conclusion with respect to the roads on Fort Meade, finding that they were "an area used by the public." *United States v. Slagle*, No. SAG-15-392, 2015 WL 5897740, at *5 (D. Md. Oct. 6, 2015). Fort Meade has one visitor access gate

---

[5] The meaning of Transp. § 21-101.1 is not at issue here. However, the *Ambrose* Court cited the analysis of this section with approval for the type of analysis that courts should use when interpreting both § 21-101.1 and § 11-127.

7

and requires visitors to have a legitimate purpose to enter the installation, but also invites many visitors to the property. *Id.* It hosts public recreational facilities and has two museums that are open to the public, and each day more than 100,000 people seek and use the services provided by the fort. *Id.* These facts demonstrated that there was widespread public use of the roads within Fort Meade. *Id.*

While the Fourth Circuit has not interpreted the definition of highway under Maryland's Transportation Code, it has applied the same analytical approach as prescribed by *Ambrose* – examining the actual public use of a roadway – in several cases involving Virginia's transportation code, which has a substantially similar definition of highway. *See United States v. Smith,* 395 F.3d 516 (4th Cir. 2005); *United States v. Adams,* 426 F.3d 730 (4th Cir. 2005); *United States v. Scott,* No. 05-5100, 2006 WL 1867344 (4th Cir. July 6, 2006) (unpublished). In *Smith,* a lost motorist under the influence of alcohol approached a CIA gate seeking directions, and an ensuing check of the defendant's license revealed that it was suspended, resulting in a citation. 395 F.3d at 517–18. In concluding that the road was not a highway, the Fourth Circuit focused on the presence of signs permitting only employees and those with authorized business onto the property, plainly establishing that the road was not open to public use. *Id.* at 520.

Following the reasoning of *Smith, Adams* held that a national park road, which had been shut down to repair damage caused by a hurricane, was not open to public use and consequently was not a highway under Virginia law. *Adams,* 426 F.3d at 732. Again, signs were posted at the entrances prohibiting unauthorized entry, and several press releases informed the public that the park was closed until further notice. *Id.* The court concluded that the prohibition on public access divested the road of its highway status, and it reversed the defendant's conviction for driving with a suspended or revoked license. *Id.*

In *Scott,* the Fourth Circuit rejected an argument that a road outside the main gate of Fort Lee was not a highway under Virginia law. *Scott,* 2006 WL 1867344, at * 1. Much like the entry process at APG, non-affiliated drivers and those without an entry decal were required to present a driver's license and vehicle registration to obtain a day pass which would allow them to drive freely on the Fort Lee roads. *Id.* The court observed that public use of the roads, subject to minimal restrictions, distinguished the case from *Smith* and *Adams,* where the roads were entirely closed to the public. *Id.*

Here the record established that 16th Avenue is contained within a private apartment complex, LaSalle Park. It is not a through road; it connects to Chillum road at two places and loops around the apartment complex. The road provides access solely to the LaSalle Park apartments and parking spots. At the two entrances to LaSalle Park on 16th Avenue there are signs posted that read, "Private Property No Trespassing," "WARNING Parking By Permit Only," and "NO Loitering, Soliciting, or Trespassing." Tr. 64:13 – 65:21. Officer Eveler testified that he understood LaSalle Park to be a private apartment complex and 16th Avenue to be a private road. Tr. 63:8-14. There is no evidence in the record that establishes the general public actually uses 16th Avenue.

This stands in contrast to the roads discussed in *Taylo*r, *Slagle*, and *Scott* above. While those roads limited visitors, there was ample evidence of their use by the public and that they were held open for that purpose. There is no such evidence here. Instead, the evidence establishes that, like the roads in *Smith* and *Adams*, 16th Avenue had signs posted permitting only authorized access to the property and did not accept visitors for public use. Therefore, 16th Avenue is not a "highway" under Transp. § 11-127, and Williams was not in violation of the lighting requirements in Transp. §§ 22-204(a) and (f).

9

The Government argues that the second phrase in Transp. § 22-204(f)[6] does not require a car to be on a highway and does not include an exception for parked vehicles. But this reading divorces this clause from the rest of § 22-204(f) and the other lighting provisions in the vehicle code. The preceding sentence of § 22-204(f) establishes that the lighting requirements for tag and tail lights do not apply when a vehicle is not on a highway or is parked. And the headlamp lighting requirement itself is § 22-201.1, which applies only to cars on a highway and creates an exception for parked vehicles. When evaluating a statute, the general rule in Maryland is to read the words in context. *Harford County v. University*, 569 A.2d 649, 651 (1990). Courts must avoid a construction of a statute that is unreasonable, illogical, or inconsistent with common sense. *Gwin v. Motor Vehicle Admin.*, 869 A.2d 822 (2005). The Government's reading of the statute would create a separate lighting requirement no matter where a vehicle is located – in a garage, in a body shop, or in a parking space on a private road – when all the other requirements for headlights, tail lights, and tag lights only apply on a highway and not to parked cars. The language and context of the Transportation Code and § 22-204(f) do not support such a reading. For the reasons stated above, Williams was not in violation of the lighting requirements in §§ 22-204(a) and (f).

## *Mistake of Law*

The Government argues that even if Williams was not in violation of Transp. §§ 22-204(a) and (f), under *Heien v. North Carolina*, 135 S. Ct. 530 (2014) and its progeny, it was a reasonable mistake of law to conclude that he was, making the stop constitutional. This is not a reasonable mistake of law and therefore does not provide a constitutional basis for the stop.

---

[6] "Any tail lamp or tail lamps, together with any separate lamp or lamps for illuminating the rear registration plate, shall be wired to be lighted whenever the head lamps or auxiliary driving lamps are lighted." Transp. § 22-204(f).

10

In *Heien*, the Supreme Court established that an officer's reasonable mistake of law could give rise to the reasonable suspicion necessary to uphold a seizure under the Fourth Amendment. 135 S. Ct. at 534. The mistake of law must be "objectively reasonable" such that a court "do[es] not examine the subjective understanding of the particular officer involved." *Id.* at 539. A reasonable mistake of law requires that a statute is "genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work." *Id.* at 541 (Kagan, J. concurring). In other words, "the statute must pose a 'really difficult' or 'very hard question of statutory interpretation.'" *Id.* In interpreting *Heien*, the Fourth Circuit recently explained: "An officer's mistake of law may be reasonable if the law is ambiguous, such that reasonable minds could differ on the interpretation, or if it has never been previously construed by the relevant courts." *United States v. Hinton*, 773 F. App'x 732, 734 (4th Cir. 2019) (unpublished).

*Heien* involved an interpretation of a North Carolina statute regarding brake lights. 135 S. Ct. at 534. An officer stopped a vehicle because one of its two brake lights was out, but a court later determined that North Carolina law only required one working brake light. *Id.* The relevant provision of the North Carolina vehicle code provides that a car must be "equipped with a stop lamp on the rear of the vehicle" and that "[t]he stop lamp may be incorporated into a unit with one or more other rear lamps." *Id.* at 536 (citation omitted). But a nearby code provision required that "'all originally equipped rear lamps' be functional." *Id.* (citation omitted). The officer interpreted these sections to mean that if one or more stop lamps are equipped, they must all be functional. *Id.* The North Carolina Court of Appeals concluded that rear lamps did not include stop lamps, notwithstanding that the phrase, "[t]he stop lamp may be incorporated into a unit with one or more other rear lamps," could suggest that a stop lamp is a type of rear lamp. Given this ambiguity, and the fact that North Carolina's appellate courts had not previously construed these provisions, the

11

Supreme Court had "little difficulty concluding that the officer's error of law was reasonable." *Id.* at 541.

In *Hinton*, the issue was whether a vehicle stopped in the road should be considered an "oncoming vehicle" under the South Carolina vehicle code. 773 F. App'x at 733–34. The South Carolina vehicle code did not define "oncoming vehicle," and no South Carolina appellate court had interpreted the relevant statute. The parties offered competing dictionary definitions for "oncoming vehicle" and conflicting interpretations from other state courts. *Id.* Under these circumstances, the Fourth Circuit found that either interpretation was reasonable and that assuming the officer made a mistake of law, it was a reasonable mistake. *Id.* at 734.[7]

Two cases from other circuit courts also are instructive. In *United States v. Lawrence*, a driver's right front and rear tires had crossed a fog line – the white line demarcating the boundary of a road – by two feet. 675 F. App'x 1 (1st Cir. 2017). An officer stopped the driver on the basis of a Massachusetts statute that provides, "When any way has been divided into lanes, the driver of a vehicle shall so drive that the vehicle shall be entirely within a single lane, and he shall not move from the lane in which he is driving until he has first ascertained if such movement can be made with safety." *Id.* at 3 (quoting Mass. Gen. Laws ch. 89, § 4A). The driver argued that this statute requires a finding that a lane movement be unsafe to establish a violation. *Id.* The government argued that the plain meaning of the first sentence of the statute requires staying within a single lane, which the driver failed to do. *Id.* at 4. There were no other Massachusetts cases squarely

---

[7] In another recent unpublished opinion, this Court concluded that "[g]iven the obscurity of the issue, a mistake about whether a driver has to use a turn signal when leaving private property does not appear to be an unreasonable mistake." *Seay v. United States*, No. DKC-15-3367, 2018 WL 1583555, at *3 (D. Md. Apr. 2, 2018), *appeal dismissed*, 739 F. App'x 193 (4th Cir. 2018). However, the parties in *Seay* did not contest this proposition, and the *Seay* opinion does not include an analysis of the issue. For those reasons, it is not helpful in resolving the issues presented here.

12

addressing this issue. Without deciding the meaning of the statute, the First Circuit held that the officer's interpretation of the statute was at least objectively reasonable. *Id.* at 6.

In *United States v. Flores*, a driver was stopped because a license plate frame covered the top portion of several letters identifying where the license plate was issued, though the officer could still read the plate. 798 F.3d 645, 646 (7th Cir. 2015). An Illinois statute requires that license plates be "clear and visible" and "maintained in a condition to be clearly legible, free from any materials that would obstruct the visibility of the plate." *Id.* at 647 (quoting 625 ILCS 5/3–413(b)). The Seventh Circuit held that it was not a reasonable mistake of law to believe that the driver was violating the law, given that if a reasonable officer could read the plate, as the evidence showed, it was unreasonable to believe that the plate's information was not clearly visible and legible. *Id.* at 649.

Here the lighting requirements for tail lights and tag lights in Transp. §§ 22-204(a) and (f) apply during the circumstances specified in § 22-201.1, including that the car must be on a highway and not parked. The Transportation Code defines both "park" and "highway." The position of Williams' vehicle met the plain language of the statutory definition of "park." And there is ample case law interpreting the definition of "highway" such that it would not be reasonable to conclude that the private road 16th Avenue was a highway. Unlike in *Heien* and *Lawrence*, there is no ambiguity where different provisions of the code suggest opposing results. Unlike in *Hinton*, the relevant terms of the Transportation Code are statutorily defined and are not subject to conflicting judicial opinions. Instead, just like a reasonable officer in *Flores* could read the license plate and determine that it was legible under the plain meaning of the relevant statute, a reasonable officer here only could conclude that Williams was parked and not on a highway, and therefore did not

meet the requirements for a tail or tag light violation under the plain meaning of the Transportation Code.

While it is true that interpreting the Transportation Code requires cross-referencing multiple sections, this is not uncommon in statutory interpretation and cannot be said to make the determination "genuinely ambiguous" or a "very hard question of statutory interpretation." *Heien*, 135 S. Ct. at 541 (Kagan, J. concurring). Here, I agree with the analysis in *Flint v. City of Milwaukee*, which explained, "Statutes frequently cross-reference each other and require some effort to connect the dots. If reasonable mistakes of law were permitted on this basis alone (without showing concomitant ambiguity), virtually no mistakes of law would be unreasonable, given the often dense and inartful structure of such statutes, *writ large*." 91 F. Supp. 3d 1032, 1059 (E.D. Wis. 2015). Likewise, as Chief Justice Roberts instructed in *Heien*: "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." 135 S. Ct. at 539–40. Accordingly, it was not a reasonable mistake of law to conclude that Williams violated Transp. §§ 22-204(a) and (f).

### Terry *Stop*

The Government argues that, even if Williams was not violating the Transportation Code and it was not a reasonable mistake of law to conclude that he was, the stop still was lawful based on a reasonable suspicion that Williams had just or was about to drive on Chillum Road with defective tail and tag lights. Because the evidence supports this reasonable suspicion, the stop was lawful. For this reason, Williams' motion to suppress is denied.

"A *Terry* stop satisfies the reasonableness requirement of the Fourth Amendment if there exists 'a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000).

"Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (citing *Ornelas v. United States,* 517 U.S. 690, 695 (1996). This standard "is less demanding than the probable cause standard or even the preponderance of evidence standard." *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (citing *Wardlow*, 528 U.S. at 123). Nonetheless, "the officer's suspicions must . . . be more than an 'inchoate and unparticularized suspicion or hunch.'" *Johnson*, 599 F.3d at 345 (quoting *Terry*, 392 U.S. at 27). That is, "the government agent must articulate a particularized, objective basis for his or her actions." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 842 (2019).

To determine reasonableness, the court considers "the totality of the circumstances." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). These circumstances include looking briefly into the past and the near future. *Johnson*, 599 F.3d at 345 ("[A] police officer whose observations lead him to suspect that a particular person has committed or is about to commit a crime [may] detain the person briefly in order to 'investigate the circumstances that provoke suspicion.'" (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881 (1975)); *Crosby v. State*, 970 A.2d 894, 903 (2009) ("[P]ursuant to *Terry* and its progeny, 'a police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion.'") (quoting *Nathan v. State,* 805 A.2d 1086, 1093 (2002)).

Here the evidence establishes that Officer Eveler had reasonable suspicion that Williams had just driven on or was about to drive on Chillum Road with defective tail and tag lights in violation of the Transportation Code. When Officer Eveler first encountered Williams on 16th

Avenue, he had stopped his vehicle with its lights on in a spot with a large yellow "X," suggesting that he had not been there for long and could not stay for long. At this point, the right tail light and tag lights were not working. When Officer Eveler returned approximately one minute later, the tail lights and tag lights were working as Williams began to drive the car before he was stopped. Sixteenth Avenue connects only to Chillum Road, which is undisputed to be a public road, and meets the statutory definition of "highway." Officer Eveler's observation of a vehicle with its lights on but a defective tail light and tag light, along with the position of the vehicle stopped in a spot with a yellow "X," and the fact that Williams actually began to drive, provide the "particularized, objective basis" to conclude that Williams had just or was about to drive on Chillum Road with defective tail and tag lights. Therefore, Officer Eveler had the reasonable suspicion necessary to justify a brief *Terry* stop to investigate the situation further.

Williams argues that any reasonable suspicion Officer Eveler may have had when he first noticed Williams' tail and tag lights were out dissipated because the lights were working when Officer Eveler returned and Williams began to drive. In support of his position, Williams points to *United States v. $85,688.00 in U.S. Currency*, 577 Fed. App'x 811 (10th Cir. 2014) (unpublished). In that case, the Tenth Circuit found that an officer's reasonable suspicion of a vehicle registration offense dissipated after an officer determined that the driver's license plate and registration were lawful. But the situation here is different. The driver's license plate and registration in *U.S. Currency* did not have the possibility of becoming defective and creating an unsafe situation soon after the stop ended. In contrast, having observed the tail and tag lights out moments before, it was reasonable to conclude that they might go out again moments later when Williams was driving on a public highway, creating a safety threat. Indeed, the evidence shows that within fifteen minutes after the stop was conducted, Williams' right tail light and tag light

16

were again not functioning. Therefore, Officer Eveler had reasonable suspicion to conduct a lawful stop of Williams. Because this stop was lawful, Williams' motion to suppress is denied.

I will schedule a telephone call with counsel to discuss further scheduling in this case.

## **ORDER**

Accordingly, it is, this 16th day of September, 2019, hereby ORDERED that Defendant's Motion to Suppress, ECF No. 18, IS DENIED.

/S/
Paul W. Grimm
United States District Judge